**Opinion issued August 29, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00325-CR**

———————————

**VINOD DEVASIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 239th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 74240**

---

**MEMORANDUM OPINION**

A jury convicted Appellant Vinod Devasia of the first-degree felony offense of aggravated sexual assault of a child under the age of fourteen. The complainant is Devasia's biological daughter. The jury imposed a sentence of sixty years in prison. In five issues, Devasia argues (1) the trial court abused its discretion in

excluding evidence that the complainant made false allegations of sexual assault against others; (2) the trial court abused its discretion in admitting the complainant's forensic interview video; (3) the trial court abused its discretion in limiting Devasia's cross-examination of the complainant's mother; (4) the trial court abused its discretion in refusing to allow admission of photographs depicting Devasia's penis to establish its "unique characteristics"; and (5) Devasia was harmed by the cumulative effect of the trial court's erroneous evidentiary rulings.

We affirm.

## Background

Devasia was charged by indictment with two separate counts of the offense of aggravated sexual assault of a child, which allegedly occurred when the complainant was between the ages of eight and fifteen, from third grade through ninth grade. The indictment[1] alleges that on or about May 26, 2009, Vinod Devasia "did then and there intentionally or knowingly cause the penetration of the sexual organ of [the complainant], a child younger than fourteen (14) years of age and not the defendant's spouse by defendant's sexual organ." The indictment further alleges that on or about May 26, 2009, Vinod Devasia "did then and there intentionally or knowingly cause the penetration of the sexual organ of [the complainant], a child younger than fourteen (14) years of age and not the

---

[1] One indictment was filed for both alleged offenses.

2

defendant's spouse by defendant's finger." *See* TEX. PENAL CODE § 22.021(a)(1)(B)(i), (2)(B). Devasia pleaded not guilty to both charges, which were tried together. A jury convicted Devasia of count one but acquitted him of count two. The jury imposed a sentence of sixty years in prison.

## The Trial

### A. Lisa[2]

Devasia's daughter Lisa, the complainant, was twenty-four when she testified. She went to elementary school and junior high school in Pearland, Texas. During that time, Lisa, her parents, and her younger brother Bobby lived in a two-story house in Pearland. Bobby was five years younger than Lisa.

The abuse began when Lisa was about eight. When she was in the third grade, her father asked her whether she knew about the birds and the bees. She testified she was thinking of the animals, not "what they are together." He took her downstairs and "started to touch me down there basically masturbation but he did it for me and he—I—he said do you feel that explosion? . . . So, he introduced me to that." Devasia then put on a cartoon for her to watch on television. When Devasia first touched her, it was over her clothes, rubbing her breast and vagina and then

---

[2]    To protect the identity of the alleged child victim, we refer to the complainant, her brother, and their mother by pseudonyms. *See* TEX. CONST. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. R. APP. P. 9.10(a)(3), (b) (making names of minors at time offense was committed "sensitive information" not to be contained in court filings).

3

went under her clothes and "he started touching [her] vagina" with his finger. It happened "[m]ultiple times."

When Devasia abused her, his penis contacted or penetrated her vagina. He always wore a condom. Lisa testified that Devasia sometimes used his fingers to "go inside a little bit and try to feel around it." That was when she was in fifth or sixth grade. She could not recall when, but the first episode of vaginal penetration happened in a hotel in Corpus Christi.

She testified that one week in junior high, her father "kept [her] home to help [her] with [her] depression and sadness. And in that one week what he would do, he would take [her] to a bubble bath in that master bedroom . . . . We're both naked and I'm in junior high. And he told me, you know, I can do home-school with you. And this is—we can do this all the time." Lisa testified, "And I still recall thinking I'm taking off from school to feel better and instead I'm being violated in a safe place that should be—you know, should be my home."

Lisa testified that the fondling or masturbation continued throughout elementary school and junior high and after the family moved to India. As the abuse continued, it became "more intense." According to Lisa, Devasia "would lie down on his back on the bed, make me lie down on top of him . . . we were both naked. He would slip his penis between my—my vagina and then he would also make—he would like—he would like vibrate his fingers and basically bring me to

4

an orgasm as well . . . ."  She testified that Devasia inserted his penis into her vagina on a regular basis.

Lisa testified that while she lived in the Pearland house, the abuse occurred in the master bedroom, in the jacuzzi in the master bathroom, in the guest room, the game room, and the living room.  According to Lisa, sometimes her brother Bobby was napping upstairs when the abuse occurred, and her mother, Brooke, was at work when it occurred, except for once when Brooke was sleeping and Devasia touched her under a blanket during a movie in the game room.

Lisa testified that at times Devasia showed her pornography.  He showed her a video about the Kama Sutra and different positions to try.  He started touching her anus with his penis.  She recalled that she was in junior high school at the time. Devasia told her not to tell anyone about the abuse.  She testified the assaults happened in her brother's room, in the guest room, the game room, the living room, and the master bedroom.

The family moved to India, and she began ninth grade there, where she spent a year and a semester.  When they were in India, the abuse continued and Devasia encouraged her to perform oral sex on him.  Lisa testified that in India, they took showers together.  She testified that she was fifteen when the last sexual act occurred with her father, and it was in India.

In 2013, Lisa, Brooke, and Bobby went on a religious retreat in India. After the retreat, she told her mother that "dad is being very inappropriate with me and he has been touching me." After Lisa told her mother about the abuse, Brooke "took a knife, went up to my dad, and threatened to cut his penis off. Didn't do it but threatened—got super angry, super protective of me." Lisa said her mother believed her when she reported the abuse. Lisa told no one about the abuse earlier because she did not want her parents to break up.

Subsequently, the entire family, including Devasia, attended a religious retreat in India. Lisa "wanted the whole family to go to [the] retreat so [her father] can get the same type of mercy and healing that I received" during the first retreat and because she "experience[d] God's love" and felt fulfilled in the first retreat. After the second retreat, the priest recommended that Lisa go to a mental hospital or a psychiatrist to "get help because I was in a lot of distress at that moment." She had never been to counseling before. She first checked into a hospital where "they had to restrain me because I was very distressed and I wanted to get out of the situation I was in. Basically, you know, they tied me down. They gave me medicine to—to sedate me and to calm me and everything." After that, her parents took her to a counselor who prescribed medicine. There was also family counseling involving just her parents.

Lisa testified that at some point she began to cut herself "[b]ecause I was trying to feel something that was missing within my heart. And I think I was so used to—to mental trauma, mental pain to the point where I just wanted to feel something else other than that." In 2013 or 2014, she was suicidal and ingested pills from the medicine closet. According to Lisa, she became suicidal "[b]ecause of all the trauma that had happened to me, sexual trauma, the confusion of where I belonged, . . . the instability of going, moving from places to places, and—not really being safe in my own home and in my own body."

In 2013, after Lisa's first semester of tenth grade, the family returned to Texas and Lisa attended Pearland High School. The family lived in a one-bedroom apartment in Pearland. The following spring, in 2014, Devasia returned to India.

Lisa attended a church camp in July 2014. While at the camp, she spoke with Ms. Katie Mahoney, the girls' coordinator for the camp. She told Ms. Katie that she was being abused by her father. She then spoke to Mr. James Carrasco, the youth coordinator for her church, who was also at the camp. Mr. James contacted the police and after the camp, a Pearland police officer and a Children's Protective Services employee came to her apartment and spoke with Lisa about the alleged abuse. Lisa told the police that Devasia penetrated her anus but at that time, she believed penetration occurred when his penis was between her buttocks

7

cheeks. After the police came to the apartment, Lisa gave a video interview at the Children's Advocacy Center in Brazoria County.[3] She was sixteen at the time of the interview.

During cross-examination, defense counsel asked Lisa to describe her father's penis, and she described her father's scrotum. She did not recall whether he was circumcised or anything out of the ordinary about her father's penis.[4] She testified that her father wore condoms during the sexual abuse but she did not put the condoms on him. She did not recall looking at his penis when she performed oral sex on him.

Lisa testified that her father beat her and Bobby with hangers, that with regard to "little simple matters he would [] be very violent with us[.]" She did not recall whether she told the CPS investigator, the forensic interviewer, or law enforcement that her father beat her. But she did tell them she was being sexually abused on a daily basis.

Prior to trial, Lisa had not seen her father since his return to India in 2014. She last spoke with him in July 2014 when he was India and she, Brooke, and Bobby were staying in the one-bedroom apartment in Pearland.

---

[3]    The jury watched the video interview, during which Lisa described the alleged assaults. During the video, she discussed the assaults that occurred in her room, in Corpus Christi, and in India.

[4]    Brooke testified that she and Devasia had sex regularly when they were married and he always used condoms. She said Devasia was circumcised but nothing was unusual or abnormal about his penis.

**B.    Brooke**

Brooke, Lisa's mother, testified next. She was born in India and later became a United States citizen. She married Devasia in 1994 and she filed for divorce in 2016. She is a nurse and worked in Ben Taub Hospital's medical surgical unit from 2004 through 2012. Brooke testified that most of the time she worked the night shift. She worked three or four days a week. Devasia took care of the children while she was at work.

In 2012, Devasia told Brooke they were moving to Mangalore, India. Their parents were in Mangalore and she missed her family. According to Brooke, that was part of the reason for the move. They also moved back to India because Devasia had land there and he wanted to take care of it.[5] The family lived in a three-bedroom apartment in India. Brooke testified that Lisa and Bobby were not happy about the move because they had to learn another language. They were struggling academically and socially when they moved to India.

When they moved to India, Devasia was receiving money from the government. The plan was for Brooke to return to the United States periodically to take care of "citizenship stuff." While the others stayed in India, she traveled twice to New Jersey. After she returned from New Jersey for the second time, she, Lisa, and Bobby attended a religious retreat in India. After the retreat, Lisa told

---

[5]    According to Bobby, Devasia was a rubber farmer in India.

9

her that her "dad aggressively [had] intercourse" with her. Lisa cried and told Brooke, "Don't tell dad and also don't divorce." After Lisa told her about the abuse, Brooke did not want to fly back to the United States without Lisa.

According to Brooke, after Lisa told her about the abuse, Brooke was angry but did not contact authorities. She testified that she feared Devasia. After Lisa's outcry, the family went on a second religious retreat in India. All four members of the family attended the retreat. After the second retreat, Lisa was committed to a psychiatric hospital, where she was treated for post-traumatic stress disorder.[6] Lisa was there a "couple of days" and was prescribed an antidepressant for the first time. After Lisa was hospitalized and prescribed medication, Lisa was "very angry" with Devasia.

When Lisa first told Brooke about having intercourse with Devasia, Brooke confronted Devasia, who "said sorry."[7] Brooke testified she was "very angry" at the time. She did not want to stay in the marriage but was "scared [not] to." Brooke confronted Devasia about the abuse, but she and the children continued to live with him.

---

[6]     Lisa was diagnosed in the United States with manic bipolar disorder.

[7]     Devasia testified he did not apologize for any actions with Lisa, but that he apologized to Brooke "to get her settled down" after she was mad. "It's just calming down–her down. That's all."

Brooke told Devasia after the second retreat that she wanted to return to the United States. She recalled that they moved a few weeks later. Brooke continued to be angry at Devasia when they returned to Pearland in 2013. In Pearland, the family moved into a one-bedroom apartment. According to Brooke, Devasia stayed with them a short time and then returned to India in the spring of 2014.

In Pearland, Lisa attended a youth ministry retreat through her church. Devasia was in India at the time. Lisa disclosed the sexual abuse at the retreat. After the retreat, detectives and a CPS worker went to Brooke's apartment. Brooke testified that the police arrived because Lisa reported the abuse during the church retreat. According to Brooke, she first told the authorities she did not know about any abuse because she was scared. But then, "I was so happy to tell them the truth. I got—I got courage to say it that time." After CPS and the police interviewed them, Brooke took Lisa to the Children's Advocacy Center in Angleton, where Lisa was interviewed. When Brooke told Devasia that the police had come to the apartment, Devasia claimed nothing had happened and that Lisa had lied.

Brooke testified that she wanted a divorce from Devasia after the police visited her but she did not "have any money or anything." She and Devasia continued to communicate regularly. "He was the one controlling the financial,

11

everything, even the computer, everything. . . . I was scared." After they sold the house, Devasia "took most of the money. . . . I also took some."

Brooke testified that Devasia was "very physically abusive. I was scared. He was the one controlling everything financially. Me and my children, everything, he was the one controlling everything." He was physically abusive toward the children, beating them, even when they were babies. She did not contact the authorities because she was scared of Devasia. In addition, she thought his abusive behavior was normal because she had seen similar behavior from her parents while she stilled lived at home. Brooke testified that Lisa is still in therapy and that they still discuss the abuse.

## C.    Katherine Mahoney

Katherine Mahoney was a youth minister at the weeklong camp Lisa attended in July 2014.[8] Lisa told Mahoney about her father's abuse and Mahoney suggested Lisa tell another youth minister, James Carrasco, about it. Lisa's conversation with Mahoney was about an hour long, and she later spoke with Carrasco for about an hour and a half.

## D.    James Carrasco

James Carrasco was a youth minister at the church camp Lisa attended in July 2014. Mahoney asked Carrasco to talk to Lisa and he did. Carrasco knew

---

[8]    Lisa lived in Pearland when she attended the church retreat with Mahoney and Carrasco.

Lisa before the camp because she attended weekly youth group gatherings. As a youth minister, he was required to report any kind of child abuse within forty-eight hours of the disclosure.

**E.    Bobby**

Bobby, Lisa's brother, was nineteen when he testified. He recalled that his father worked from home the majority of the ten years they lived in the house in Pearland. He recalled having family nap times. At first, Lisa, Devasia, and he would nap together, but eventually Bobby began to feel "uncomfortable" and went to his room to nap, leaving Lisa and Devasia to nap together in the master bedroom.

When they moved to India, Brooke did not work outside the home. Bobby recalled being in India for one to one-and-a-half years. He remembered attending two religious retreats in India—the first with Brooke and Lisa and the second with his entire family. He recalled that Lisa was hospitalized after the second retreat.

According to Bobby, Devasia "was the main controlling parent." However, he testified that it was Brooke's decision to return to the United States. "[S]he wanted to protect us. Bring us back home."

When the police and CPS came to their Pearland apartment, they arrived around midnight and talked to Brooke and Lisa. CPS also interviewed Bobby. He told CPS he had not experienced sexual assault by Devasia, but he subsequently

13

told them Devasia physically abused him. He recalls being in elementary school learning his ABCs and his father "repeatedly" hitting him in the forehead a "bunch of times" with a belt or a hanger. His father would teach him and "each time I got [] a question or something wrong, he would—he would hit me with like a hanger or a belt repeatedly like I was an animal. And he also hit my sister and my mom as well repeatedly." This occurred when Bobby was four to nine years old.

Bobby testified that Devasia beat him and Lisa in India in front of Brooke. "[Brooke] was aware, but she was controlled by him. So, a fear—the fear that he imposed on every one of us kind of—kind of—kind of stopped us from reaching out because we were scared." Bobby testified that Lisa ran away from home in India, cried a lot, and some days "she wouldn't really get up most of the day."

Bobby last saw his father and spoke to his father about ten years before trial, in 2013 or 2014.

## F. Kristi Hawkins

Kristi Hawkins, executive director of the Brazoria County Alliance for Children,[9] a child advocacy center, testified that she interviewed Lisa and Bobby in July 2014. Her interview of Lisa, who was sixteen, was an hour and two minutes and Bobby's interview was approximately 22 minutes. Bobby, who was eleven, told her during the interview that he was not sexually assaulted but that his father

---

[9]     Children are referred to the Child Advocacy Center by law enforcement or CPS.

14

physically abused him.[10]  She testified that Bobby did not know about the sexual abuse and said his dad would never do that.

Lisa told Hawkins her father sexually abused her multiple times a week for years at a time.  She said the abuse occurred in her bedroom.  Lisa also told her Devasia often touched her in the shower.

## G.    Detective Meredith Jaso

Detective Meredith Jaso is a Pearland police officer.  She was the primary investigator on Lisa's case, which was a CPS referral.  Detective Jaso and a CPS worker spoke to Lisa alone for forty-five minutes to an hour at her apartment. When Detective Jaso interviewed Lisa, "[s]he was very forthcoming, and she spoke very candidly about what had occurred to her."  Detective Jaso did not believe Lisa was in immediate danger when she wrote her report, as she knew Devasia was out of the country and the alleged abuse had stopped.  During her conversation with Lisa, Detective Jaso learned that Lisa had tried to commit suicide by overdosing on Tylenol.

After speaking with Lisa, Detective Jaso spoke with Brooke, who said she did not know why they were there.  Detective Jaso was surprised, given that the CPS referral indicated that Lisa had told her mother about the alleged abuse.  After Detective Jaso spoke with Lisa, Brooke seemed to understand why Detective Jaso

---

[10]     Hawkins subsequently said Bobby did not tell her he was "regularly beaten" by his father.

and CPS were at the apartment. "I think initially she was somewhat hesitant. When I gave her some information that I had obtained in speaking with [Lisa], I think she was a little more understanding." However, Brooke "believed that this [abuse] had only occurred once. She was aware of one incident [when] they had sexual intercourse." Detective Jaso "let her know that according to [Lisa] this was occurring more than that; four times a week in different poses and—different manners. Sometimes three times a day. I don't think she understood that initially. That wasn't articulated to her. I don't think the outcry that was told to her was of that weight." Detective Jaso testified that she determined the abuse happened in the Pearland house when Brooke was not home—either when Brooke was working night shifts or when Lisa stayed home from school.

Detective Jaso attempted to contact Devasia in India but was not successful. She understood from Brooke that Devasia was aware of the CPS investigation. Detective Jaso testified that Devasia moved back to India approximately a year before Detective Jaso's visit to the apartment, although he had been back for a visit.

Detective Jaso spoke with Carrasco and attempted unsuccessfully to contact Mahoney. After speaking with the witnesses and after watching the forensic interview, Detective Jaso wrote her report and called the district attorney's office, which told her to file the case with the grand jury. The grand jury true-billed the

16

case and formal charges were filed against Devasia. Devasia was arrested in 2021 and extradited to the United States from India.

## H.  Vinod Devasia

Devasia testified at trial. Like Brooke, he was born in India and later became a United States citizen. When he lived in Pearland, he worked at Chevron from 8 a.m. to 4 p.m., enabling him to drop the kids off at school and pick them up if necessary. Brooke had an evening nursing job three or four days a week at Ben Taub Hospital. Eventually, Brooke moved to a day shift. In 2009, Devasia developed a cholesteatoma, a small benign tumor on his ear that caused dizziness, among other things. He fell and was hospitalized. He then took long-term disability for six months.

According to Devasia, Brooke got angry sometimes. She wanted to go back to India, but he did not want to move back. He denied being physical with his wife or hitting his children with a hanger. Devasia was the disciplinarian. He would lightly give the children "a small spank at the back" if they needed it—just enough to scare them. At that time, he rarely had to discipline Bobby and never had to discipline Lisa. He was responsible for the children and their academics and their afterschool activities.

Devasia testified that contrary to Brooke's testimony, he was not controlling, it was just that Brooke took no responsibilities for the household. Devasia and

Brooke had a joint bank account and the house was in both of their names. He was the one responsible for paying the bills.

Devasia testified that Brooke did not like the United States and wanted to return to India. They jointly made the decision to move and arrived in India in May 2012. Devasia testified that moving to India was "a big mistake." "[I]t was very hard on the kids for sure." The school day was the same length but because the kids had to take the bus to and from school, they did not finish their homework until 8 p.m. According to Devasia, Lisa had an easier time adjusting than Bobby. Lisa "can take a couple of challenges" but if they had not moved back, "I'm pretty sure [Bobby] would also have had a psychotic break. I can say that for sure." However, he said school was overwhelming for Lisa "because the kids didn't have any time for themselves." "At first I can see they were having stress with the homework. . . . I started noticing [Lisa's] problem after her first time leaving for the retreat with—that is [Lisa, Brooke, and Bobby] went for the retreat."

After the retreat, Brooke "came to me and said [Lisa] had said something about the thing like me touching her or something like that." "She said like I touched her. That's what—and I said what . . . like we always—our family we had a family hug. When we're going out, family hug. . . . So, I thought maybe that's

what—no, no. She said something like that. So, I was shocked."[11] He first noticed Lisa having mental health issues after the retreat in 2013.

All four members of the family went on a second retreat. The priest at the retreat told Brooke and Devasia that Lisa needed to be admitted to the retreat hospital. Lisa was admitted to the hospital and Brooke went with her. Bobby and Devasia stayed at the retreat. Lisa was put on medication at the hospital. After the retreat, Lisa was taken to a mental hospital and examined. Lisa was "disoriented. She ha[d] no clue what's happening."

In October 2013, the family moved back to the United States so that Brooke could keep her green card, and because Lisa had missed so much school that she was not going to be allowed to graduate from tenth grade. The plan was to stay in Pearland until Brooke became a citizen and then move back to India. Devasia traveled back and forth to India and returned to Pearland in May 2014, when he "saw [that] the kids [were] more happy" in the United States and he "realize[d his] mistake that India is not the right place. So, at that point I told everybody that, okay, I think U.S. is better. We'll—we'll move back here and I'll come back."

In July 2014, Devasia was in India when he learned about the CPS investigation of the sexual assault allegations. Brooke called him and told him the

---

[11]     According to Devasia, when Lisa made the accusation against him in India, he was not investigated "because we didn't think that was happening or anything like that."

police had come to the apartment. He testified he did not know what to do and that he did not know what was going on. When Devasia found out Lisa had accused him in the United States of sexual assault, he "could not really believe it[.]" "I could not believe something my—my daughter is accusing me on that."

Devasia testified that it took him two years to get information from CPS about the investigation. He also attempted to contact Brooke to find out more information. After obtaining information about the CPS investigation, he was planning to return to the United States once he obtained counsel. He did not know criminal charges were pending against him in the United States. In 2019, when he attempted to renew his passport, the U.S. Consulate told him they were revoking his passport. He then learned there was a warrant for his arrest in the United States. He was arrested on the sexual assault warrant and extradited to the United States in 2021.

Devasia testified that he was circumcised as an adult. Because of the procedure, his penis has "a scar mark . . . where the stiches [were]." In addition, there are black markings on his penis. He testified that he always used clear condoms. At this point, Devasia's counsel sought permission from the trial court to have Devasia show his genitals to the jury. The State argued that doing so would be prejudicial and that the same result could be "accomplish[ed] by photographs." The trial court judge stated that he would not allow Devasia to

show his genitals to the jury but stated Devasia could attempt to introduce photographs. Devasia sought to introduce photographs of his genitals into evidence, but the State objected to the admission of the photographs because the offered photos had been taken a week before trial and thus were not reflective of Devasia's genitals during the relevant time frame.[12] The court sustained the objection. At his counsel's direction, Devasia then drew a picture of his penis for the jury.[13]

Devasia testified that he watched pornography as a teenager and occasionally with Brooke when Lisa was very young but "we were not really interested in that." He said he never forced Lisa to watch pornography.

Devasia did not seek visitation with his children as part of his divorce from Brooke. Lisa and Bobby have not spoken to him since 2014. Devasia testified he did not sexually abuse Lisa, stating, "I know it's not true and I really care for my kids."

---

[12]    The photos were taken a week before trial in 2023. Lisa alleges Devasia assaulted her between 2006 and 2014.

[13]    The drawing of Devasia's penis was not marked as an exhibit but was drawn on a large sheet of paper for the jury.

## Rule 412 Hearing

The trial court conducted a Rule 412 hearing outside the presence of the jury.[14]   Texas Rule of Evidence 412 provides that "specific instances of a victim's past sexual behavior" are not admissible in a prosecution for sexual assault unless the evidence "relates to the victim's motive or bias" or "is constitutionally required to be admitted" and "the probative value of the evidence outweighs the danger of unfair prejudice."  TEX. R. EVID. 412(b)(2)(C), (b)(2)(E), (b)(3).[15]

During the hearing, Devasia argued that Lisa had falsely accused one or two of her uncles and her brothers' friends of sexual abuse in India.  He also argued that Lisa had made allegations of sexual assault against him because she was unhappy in India and wanted to move back to the United States.  The following testimony was elicited from Lisa during the hearing:

| Devasia's counsel: | When you were in India . . . this is the first time that you had ever accused anyone of sexual assault? |
|---|---|
| Lisa: | As soon as I reached India or— |
| Devasia's counsel: | While you were there— |

---

[14]   Texas Rule of Evidence 412, also known as the "Rape Shield Law," governs the admissibility of a victim's past sexual behavior in a prosecution for sexual assault. TEX. R. EVID. 412.

[15]   Before evidence of a victim's past sexual behavior is offered, the trial court must "conduct an in camera hearing, recorded by a court reporter, and determine whether the proposed evidence is admissible." TEX. R. EVID. 412(c).

Lisa: Okay.

Devasia's counsel: —it was not only your father who you accused of sexual abuse, your uncles were also accused of sexual abuse?

Lisa: One uncle, not uncles.

Devasia's counsel: Okay. You say one uncle. If—if there's statements that you accused two uncles, that would be incorrect. Is that your testimony?

Lisa: Yes.

Devasia's counsel: And that accusation was deemed to be false by your family, wasn't it?

Lisa: Could you repeat that again, please?

Devasia's counsel: After you accused your uncle or uncles, that accusation was determined by your family to be false?

Lisa: I don't know.

Devasia's counsel: You don't know?

Lisa: No.

Devasia's counsel: Did—was—was your uncle ever arrested?

Lisa: No.

Devasia's counsel: Was your uncle ever brought to trial?

Lisa: No.

Devasia's counsel: Was he ever convicted of a crime?

23

| | |
|---|---|
| Lisa: | No. |

. . .

| | |
|---|---|
| Devasia's counsel: | And while you were in India, you also accused . . . actually the accusations were furthered in your statements to the police in Pearland—right—the accusations against your uncle and your brother's friends? You shared those—those accusations with the investigators here in the United States. Right? |
| Lisa: | I don't remember. |

Lisa further testified:

| | |
|---|---|
| Devasia's counsel: | [Lisa], you talked to CPS in regards to this case . . . . Right? |
| Lisa: | Yes. |
| Devasia's counsel: | Okay. And you shared with them about the abuse by your father as well as by your uncle. Correct? |
| Lisa: | I don't remember. |
| Devasia's counsel: | Okay. |
| Lisa: | I remember my father's abuse. |
| Devasia's counsel: | But you don't recall abuse by your uncles or by your brother's friends? |
| Lisa: | Could you repeat the last question, please. |

. . .

24

| | |
|---|---|
| Devasia's counsel: | So, [Lisa], you spoke with CPS about prior abuse not only by your father but by your uncle and by your brother's friends. Isn't that right? |
| Lisa: | I don't remember. |
| Devasia's counsel: | You don't remember that? |
| Lisa: | No. |
| Devasia's counsel: | You testified a moment ago that you remember your uncle sexually abusing you. |
| Lisa: | Yes. |
| Devasia's counsel: | But you don't remember reporting that to anyone? |
| Lisa: | I don't remember if I reported it or not. |
| Devasia's counsel: | And you don't remember if you reported about your brother's friends sexually abusing you? |
| Lisa: | That is not true. |
| Devasia's counsel: | That would be a lie? |
| Lisa: | Could you repeat it again, please? |
| Devasia's counsel: | Just making sure I understood what you just said. If there was an allegation that you were abused by your brother's friends, that would be a lie. Is that correct? |
| Lisa: | Yeah. |

Devasia's counsel then questioned Lisa about her purported motive in making the allegations of sexual assault against Devasia:

> Devasia's counsel: When you came—when you started—well, when you told your parents—or your mother specifically about the abuse one of the reasons you came back to the United States was because of that abuse, wasn't it?
>
> Lisa: Yes.

During his argument, Devasia's counsel relied on Rule 412(b)(2)(C) and (b)(3) to argue that Lisa's prior allegations of sexual abuse against her uncles and her brother's friends were admissible to establish her "motive or bias" in making the allegations of abuse against her father. He argued that even though Lisa testified that there had been "ongoing sexual abuse by her father," there was "no outcry, no allegation of sexual abuse by her father until India" at which time "not only is she accusing her father of sexual abuse, she's accusing her uncle . . . [and] her brother's friends." He argued that Lisa was "accusing multiple individuals of sexual abuse at that time which spur[red] her move and reunion with her family back in the United States in Pearland." He argued that Lisa's prior allegations of abuse were "fabricated" or "motivated by something other than truth" and went to Lisa's "motive for making the original accusations against her father." He continued:

> When it comes to this circumstance, we've already heard testimony from the complainant that nothing occurred after those allegations

26

were made against the uncle, nothing in the family—or there were no police reports or investigations against the other family members. And the only occurrence of further investigation or prosecution occurred against her father when they returned to the United States and CPS got involved which supports the argument that the allegations against the uncle and the brother's friends were false or were—were motivated by something other than the truth.

Devasia's counsel concluded:

[Lisa] had been removed from her home in Pearland, taken to India, whole new situation, and one of the means by which she can return— and she stated one of the reasons she was able to return to the United States was because of these allegations of sexual assault, not only with her father, but by her uncle and others. And so, that goes to her having, you know, an independent reason to make up and fabricate these stories against her family members.

The State responded that Lisa's allegations "that the uncle might have touched her or that the brother's friends might have touched her" had no relevance with respect "to the outcry in India that her father had been sexually abusing her for many years." It argued that "allegations against someone else would be a specific instance of conduct which is clearly outlawed by the rule unless" Devasia could satisfy a listed exception under the rule, which the State argued he had not. According to the State, admitting testimony about Lisa's prior allegations against her uncle and her brother's friends would violate both Rule 412 and Rule 403, the latter of which allows a trial court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or

27

needlessly presenting cumulative evidence." TEX. R. EVID. 403. Devasia replied that the evidence went to Lisa's "willingness to fabricate stories as far as against her father and other members of the family" and that as far as Rule 403 went, "it's a question of whether or not she has the credibility when it comes to these statements that she's making, these allegations." He argued Lisa had an "independent reason to make up and fabricate these stories against her family members."

At the conclusion of the 412 hearing, the trial court held that evidence concerning allegations of sexual assault against others was inadmissible:

> I don't know that there was any evidence to suggest that that is, in fact, [Lisa's] motive or that was what she was seeking while she was there, at least I didn't hear any testimony to that effect.

> Further, I don't know that the exceptions under [Rule 412](b) for specific instances of the victim's past sexual behavior necessarily fit the mold for anything other than what would be the victim's motives or bias. And I just don't know that we—that we can make that link at this point in time. So I'm not going to allow that. That's not going to be admissible at this time.

### Offers of Proof

Devasia made two offers of proof after both sides rested.

### A.    The Photos

Devasia made an offer of proof in response to the trial court's refusal to admit the two photographs of his genitalia. Devasia testified that he took the photos a week before trial and that he sought to offer the photos into evidence to

28

show "the uniqueness as well as identifying factors for Vinod Devasia's penis." He said he was circumcised as an adult in 1997, which was before the alleged sexual assaults for which he was on trial, and that as a result of the circumcision he had markings on his penis which are not "normal."[16] His counsel argued there had "been previous discussion and previous testimony in regards to the sexual acts occurring in daylight on multiple occasions . . . and these . . . discerning marks on his . . . penis that have been there since birth [] should have been identified and could have been identified by the complainant."

## B.    Previous Sexual Assault Allegations

In response to the trial court's ruling excluding testimony about Lisa's allegations of sexual assault against others, Devasia argued that testimony and medical records[17] should have been admitted regarding the sexual assault accusations Lisa made "against her brother's friends as well as further alleged outcries against her uncle or uncles in India." Devasia argued that medical records reflecting the allegations Lisa made against others "clearly illustrate[d] that she is willing to make statements which we would argue are false statements against other male relatives in her family which goes to her motive in this case."

---

[16]    According to testimony during the offer of proof, the circumcision left certain markings on Devasia's penis, including "scarring" and "stitching," and there was "discoloration" that he had always had.

[17]    The medical records refer to allegations of abuse by Lisa's father and uncle.

The jury convicted Devasia of count one and acquitted him of count two. The jury imposed a sentence of sixty years' imprisonment. This appeal ensued.

**Standard of Review**

We review a trial court's ruling on the admission of evidence for abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010); *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or "without reference to any guiding rules or principles." *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

The erroneous admission or exclusion of evidence generally constitutes non-constitutional error, subject to a harm analysis that requires reversal only if the error affected the substantial rights of the accused. TEX. R. APP. P. 44.2(b); *Gonzalez v. State*, 544 S.W3d 363, 373 (Tex. Crim. App. 2018). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if we have fair assurance after examining the record that the error did not influence the jury or influenced the jury only slightly. *Chaves v. State*, 630 S.W.3d

30

541, 557 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (citing *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011)).

The Sixth Amendment's Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "[A]lthough a defendant's right to confrontation and cross-examination is constitutionally safeguarded, it is not absolute." *Cruz–Escalante v. State*, 491 S.W.3d 857, 860 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Del. v. Van Arsdall*, 475 U.S. 673, 678–79 (1986)). While a defendant may cross-examine a witness "on any subject reasonably calculated to attack his credibility, such as exposing a motive, bias, or interest," the trial court has "considerable discretion in determining how and when bias may be proved, and what collateral evidence is material for that purpose." *Cruz–Escalante*, 491 S.W.3d at 860; *see also Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009). A trial judge "may limit cross-examination to prevent harassment, prejudice, confusion of the issues, harm to the witness, and interrogation that is repetitive, marginally relevant, or not calculated to reveal bias or motive to testify falsely." *Barber v. State*, No. 01-99-00506-CR, 2000 WL 490726, at *1 (Tex. App.—Houston [1st Dist.] Apr. 27, 2000, pet. ref'd) (mem. op., not designated for publication) (citing *Cantu v. State*, 939 S.W.2d 627, 635 (Tex. App.—Houston [1st Dist.] 1997, no pet.)); *see also Hammer*, 296 S.W.3d at

561 n.7 ("'[T]rial judges retain wide latitude' under the Confrontation Clause to impose restrictions on cross-examination based on such criteria as 'harassment, prejudice, confusion of the issues, the  witness' safety, or interrogation that is repetitive or only marginally relevant.'") (quoting *Van Arsdall,* 475 U.S. at 679).

We review the extent of cross-examination of a witness under an abuse of discretion standard.  *Barber*, 2000 WL 490726 at *1. Error in limiting cross-examination is subject to a constitutional harm analysis.  *Fox v. State*, 115 S.W.3d 550, 568 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).  Using a constitutional harm analysis, the reviewing court must reverse unless it "concludes beyond a reasonable doubt that the error did not contribute to the conviction or the punishment assessed."  *Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011) (quoting *Harris v. State*, 790 S.W.2d 568, 584 (Tex. Crim. App. 1989)).  In a constitutional harm analysis, "[o]ur task is to calculate, as nearly as possible, the probable impact of the error on the jury in light of the evidence adduced at trial."  *Wappler v. State*, 183 S.W.3d 765, 777 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

While the erroneous admission or exclusion of evidence is generally nonconstitutional error, "[e]rroneous exclusion of evidence can rise to the level of constitutional error . . . when the excluded evidence 'forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a

32

defense.'" *Wilson v. State*, 451 S.W.3d 880, 886 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (quoting *Potier v. State,* 68 S.W.3d 657, 665 (Tex. Crim. App. 2002)). Sexual assault trials "may raise particularly evidentiary and constitutional concerns because the credibility of both the complainant and defendant is a central, often dispositive issue." *Hammer*, 296 S.W.3d at 561. If excluded testimony "goes to the heart of the defense," any error is constitutional. *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002). The Court of Criminal Appeals has observed that each individual case must be examined "to determine whether the Confrontation Clause demands the admissibility of certain evidence." *Lopez v. State*, 18 S.W.3d 220, 225 (Tex. Crim. App. 2000).

### Accusations Involving Others

In his first issue, Devasia contends that the trial court erred by excluding evidence that Lisa "made previous false allegations of sexual assault" against two uncles and her brother's friends. He argues that evidence of Lisa's prior allegations of sexual assault was admissible under Rule 412 because "it spoke directly to her motive or bias in testifying against her father, and it was constitutionally required to be admitted at trial." He argues that Lisa made "multiple false accusations" in order to prompt a move back to Pearland from India and that his "constitutional right[] to present a complete defense was violated by the trial court's exclusion" of such evidence. The State counters that there was no

33

error because there is no evidence that any of Lisa's previous allegations were false and further that Devasia did not establish any exception allowing the admission of such evidence under Rule 412.

Rule 412 provides that "reputation or opinion evidence of a victim's past sexual behavior" and "specific instances of a victim's past sexual behavior" are not admissible in sexual assault cases. TEX. R. EVID. 412(a). Evidence of specific instances of a victim's past sexual behavior is admissible, however, if the evidence:

> (A) is necessary to rebut or explain scientific or medical evidence offered by the prosecutor; (B) concerns past sexual behavior with the defendant and is offered by the defendant to prove consent; (C) relates to the victim's motive or bias; (D) is admissible under Rule 609; or (E) is constitutionally required to be admitted[.]

TEX. R. EVID. 412(b)(2). The proponent of the evidence must establish that "the probative value of the evidence outweighs the danger of unfair prejudice." TEX. R. EVID. 412(b)(3).

The Court of Criminal Appeals has held that prior false accusation evidence is generally not admissible in sexual assault cases. "A criminal trial . . . is designed to find the truth about a specific incident, not to decide whether someone has lied in the past about . . . being raped. Prior false allegations of rape do not tend to prove or disprove any of the elements of the charged sexual offense." *Hammer*, 296 S.W.3d at 564. "A sexual assault complainant is not a volunteer for

34

an exercise in character assassination." *Id.* However, if the proponent "offers evidence of a prior false accusation of sexual activity for some purpose other than a propensity attack upon the witness's general character for truthfulness, it may well be admissible under our state evidentiary rules." *Id.* at 565.[18]

Devasia argues that testimony of Lisa's prior allegations of sexual assault against others was admissible to prove Lisa's motive in accusing him of sexual abuse. According to Devasia, his defense was based on the theory "that the multiple false accusations allowed [Lisa] to move back to Pearland, and the evidence speaks to her motive to falsely accuse" Devasia. The State responds that

---

[18]   The court in *Hammer* discussed Texas Rules of Evidence 412, 608(a)-(b), and 613(b). Rule 608(a) provides that:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

TEX. R. EVID. 608(a). Rule 608(b) states that "[e]xcept for a criminal conviction under Rule 609, a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." *Id.* 608(b). "Rule 613(b), which creates an exception to Rule 608(b), provides that a witness may be impeached by using extrinsic evidence to show bias or interest." *See Billodeau v. State*, 277 S.W.3d 34, 40 (Tex. Crim. App. 2009) (discussing Rules 608(b) and 613(b)). Devasia and the State invoked only Rule 412 and Rule 403 in making their arguments to the trial court and in advancing their position on appeal. They did not assert Rule 608(b) or Rule 613(b).

Devasia failed to establish that the prior allegations of sexual abuse were false and thus, the trial court did not err.[19] We agree.

"For evidence of extraneous allegations to be admissible to impeach the credibility of the complaining witness, and thus have a probative effect, there must be a showing that the accusations were false." *Garcia v. State*, 228 S.W.3d 703, 706 (Tex. App—Houston [14th Dist.] 2005, pet. ref'd) (holding evidence that complainant made accusation of sexual abuse against her father was inadmissible to impeach credibility of the complainant's allegations of abuse against defendant because the "proffered evidence [did] not establish falsity"); *Cozart v. State*, No. 01-15-01007-CR, 2017 WL 3910696, at *9 (Tex. App.—Houston [1st Dist.] Sept. 7, 2017, pet. ref'd) (mem. op., not designated for publication) (same); *see also Lopez*, 18 S.W.3d at 225 ("Without proof that the prior accusation was false or that the two accusations were similar, the evidence fails to have any probative value in impeaching [the complainant's] credibility in this case."); *Palmer v. State*, No. 01-08-00141-CR, 2010 WL 1729338, at *12 (Tex. App.—Houston [1st Dist.] Apr. 29, 2010, no pet.) (mem. op., not designated for publication) (holding trial court did

---

[19] Even though the State did not make this specific argument in the trial court, because it was the prevailing party during trial, "the State may advance on appeal and on discretionary review any reason to uphold the trial court's ruling." *Ivy v. State*, No. PD-0119-16, 2016 WL 1719376, at *1 (Tex. Crim. App. Apr. 27, 2016) (not designated for publication); *see also State v. Mercado*, 972 S.W.2d 75, 77 (Tex. Crim. App. 1998) (observing court's approval of appellate courts considering alternative theories of law that support trial court's decision).

not abuse discretion in sustaining State's objection to evidence of previous sexual abuse accusation when "[t]here was no showing that the prior allegation of abuse was a false accusation").

According to Devasia, Lisa "admitted" during the Rule 412 hearing that her previous statements to law enforcement that her uncles sexually assaulted her "were false" and that "if there was an allegation that she was abused by her brother's friends, that would be a lie." As it concerns evidence of Lisa's alleged allegations of abuse against Bobby's friends, the State responds that Devasia's question was hypothetical, and that Devasia did not produce evidence of any allegation against Bobby's friends "to impeach [Lisa] or refresh her recollection, nor did [Devasia] [] attempt to recall [Lisa] later."[20] Indeed, the record lacks any reference to accusations of abuse by Bobby's friends, other than Devasia's counsel's reference to the alleged abuse while questioning Lisa during his offer of proof. Nor does the record establish that Lisa reported at any time that two uncles previously assaulted her. Lisa testified during the Rule 412 hearing that one uncle, not two, sexually assaulted her, and there is no evidence that she retracted the

---

[20] When asked if she had spoken "with CPS about prior abuse not only by your father but by your uncle and by your brother's friends," Lisa testified, "I don't remember." Devasia's counsel then asked, "If there was an allegation that you were abused by your brother's friends, that would be a lie. Is that correct?" and Lisa replied: "Yeah." As the State points out, this was a hypothetical question. Moreover, as noted, the medical records included in the reporter's record reflect accusations of sexual abuse against Devasia and Lisa's uncle, but not against her brother's friends.

allegation or that the allegation was false.[21]   The testimony that according to Devasia reflects Lisa's "admission" that her allegations of sexual assault against her uncles were false does not reflect such an admission.  Lisa testified:

| | |
|---|---|
| Devasia's counsel: | [I]t was not only your father who you accused of sexual abuse, your uncles were also accused of sexual abuse? |
| Lisa: | One uncle, not uncles. |
| Devasia's counsel: | Okay.  You say one uncle.  If—if there's statements that you accused two uncles, that would be incorrect.  Is that your testimony? |
| Lisa: | Yes. |
| . . . | |
| Devasia's counsel: | After you accused your uncle or uncles, that accusation was determined by your family to be false? |
| Lisa: | I don't know. |

Contrary to Devasia's argument, this testimony does not establish that Lisa's allegations against her uncle were false. To the extent Devasia argues that the falsity of her allegations is established because Lisa's uncle was "never arrested, investigated or prosecuted," that argument lacks merit.  *See, e.g.*, *Lopez*, 18 S.W.3d at 225–26 (holding that even though Texas Department of Human Services had "closed" its case into complainant's prior abuse accusations and had "ruled" out

---

[21]   Devasia acknowledges in his brief that Lisa reported in treatment at West Oaks Hospital that one uncle, not two uncles, sexually abused her.

alleged prior abuse, allegations were not proved to be false, as there could simply have been "a lack of evidence to prove the allegation at that time, or an administrative decision that, despite the allegation's validity, the parties would best be served by closing the case"); *Garcia*, 228 S.W.3d at 706 (holding that dismissal of charges against father accused of sexual abuse did not prove that daughter's allegations of abuse were false).[22]

Given Devasia's failure to establish the falsity of any prior allegations—or even that the allegations were made against two uncles or Bobby's friends—we hold the trial court did not err in excluding testimony regarding previous allegations of sexual abuse. *See Lopez*, 18 S.W.3d at 225–26 (holding trial court did not err in excluding evidence of prior accusations because "[w]ithout proof that the prior accusation was false or that the two accusations were similar" evidence did not have "any probative value in impeaching [the complainant's] credibility"

---

[22] Devasia relies on *Thomas v. State*, 669 S.W.2d 420 (Tex. App.—Houston [1st Dist.] 1984, pet. ref'd) in arguing that "when the complainant herself admits that prior allegations were false, the Constitution requires the defendant to be permitted to cross-examine her on those false allegations." In *Thomas*, the complainant testified she told her mother that she was sexually assaulted, and the mother confirmed the accusation was made. *Id.* at 422–23. The appellant "show[ed] by the testimony of complainant and her mother that at least one of the [complainant's] prior accusations was false." *Id.* at 423. We held that testimony of the false accusation should have been allowed. *Id.* In contrast, neither Lisa nor Brooke nor any other witness testified during the Rule 412 hearing that Lisa accused her brother's friends of sexual assault, or that any accusations made by Lisa were false; Lisa was merely answering a hypothetical question posed by Devasia's counsel. Thus, *Thomas* is inapposite. *See Lape v. State*, 893 S.W.2d 949, 955 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) (distinguishing *Thomas*).

39

and for the "same reasons, the risk that th[e] evidence would unduly prejudice and confuse the jury was high").

We overrule Devasia's first issue.

### The Forensic Video

In his second issue, Devasia complains that the trial court erred by admitting into evidence the forensic video interview Lisa gave to Kristi Hawkins, the executive director of the Brazoria County Alliance for Children. Following Devasia's cross-examination of Hawkins, the State sought to introduce the video "to dispel the misimpression that the [Hawkins'] questioning [in the video] was suggestive" and under the rule of optional completeness "because [Hawkins] was asked certain questions and we're entitled to get into the contents of the remaining interview."[23] The State argued that defense counsel had "accused [Hawkins] of

---

[23] Texas Rule of Evidence 107, known as the Rule of Optional Completeness, provides:

> If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent. "Writing or recorded statement" includes a deposition.

TEX. R. EVID. 107. Rule 107 is a rule "of admissibility [that] permits the introduction of otherwise inadmissible evidence when the evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party." *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007); *see also Castillo v. State*, 573 S.W.3d 869, 877 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) ("The rule of

[asking] suggestive questions and trying to lead [Lisa] to make a specific answer. And . . . the State is entitled to correct those misimpressions based on the misimpressions [defense counsel] has presented to the jury." Defense counsel argued that the video was not admissible because it was "more prejudicial than probative" and she was merely following up the State's questions to Hawkins regarding her interview of Lisa. The trial court ultimately held the video was admissible.

On appeal, Devasia argues the ruling was error because it allowed the "State to improperly bolster its case and [Lisa's] credibility." He argues that defense counsel did not "open the door" and further that the State was not entitled to "admission of the entire video." The State responds that the trial court did not err in admitting the video because Devasia opened the door to its admission starting with his opening statement where he argued that the "investigator [was] not being [an] objective, critical party as they should be in an investigation," continuing through his cross-examination of Lisa where he inquired whether she felt the investigator had "her best interest in mind," and concluding with his cross-examination of Hawkins when he intimated that Hawkins had asked Lisa suggestive questions. The State does not address Devasia's argument that admission of the "entire" video was in error.

optional completeness is an exception to the hearsay rule.") (citing *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011)).

41

We conclude that the trial court did not err in admitting the video into evidence. Devasia objected to admission of the video as "more prejudicial than probative." This appears to be an objection based on Texas Rule of Evidence 403.[24] Because he did not address Rule 403 in his appellate brief, we hold that any argument based on the prejudicial-versus-probative argument is waived. *See* TEX. R. APP. P. 38.1(i) (brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

Devasia also objected because of lack of notice of the video, and because the State had asked questions in direct examination regarding the conversation between Lisa and the interviewer, "so the defense was entitled to cross examine on that topic." Devasia's briefing, however, is confined to the issue of optional completeness and whether the defense "opened the door" to admission of the video. We thus limit our analysis to those issues.

Devasia argues that after the State elicited testimony from Hawkins that she "asked [Lisa] open-ended questions that were non-leading" and that Lisa understood the difference between a lie and the truth, the defense simply "rebutted the impressions left by the State and questioned the efficacy of [Hawkin's]

---

[24] Under Rule 403, the danger of unfair prejudice must substantially outweigh the probative value. TEX. R. EVID. 403.

questioning and the veracity of her testimony."[25]  The record reflects that during cross-examination, Devasia questioned Hawkins extensively about her interview techniques.  The following testimony was elicited during Devasia's cross-examination of Hawkins:

| | |
|---|---|
| Devasia's counsel: | . . . But during the interview, there were several times where you would ask [Lisa] questions and then you would pause and wait for an answer.  Correct? |
| Hawkins: | Correct. |
| Devasia's counsel: | And as part of that, you were—you are saying to this child you want a response about whether something occurred.  Would you agree with me on that? |
| Hawkins: | I would agree, yes. |
| Devasia's counsel: | For example, if I'm going to ask you a question and say did this happen, there's an assumption that something happened after I make that pause.  Would you agree with me? |
| Hawkins: | No, I wouldn't agree with that. |
| Devasia's counsel: | What if you asked the same question multiple times and then paused and looked at the child?  Is that suggestive to you? |
| Hawkins: | I don't think if they haven't answered the question, no. |

---

[25]  Devasia's counsel concedes she questioned Hawkins as to "whether certain techniques employed with [Lisa during the video interview] were suggestive."

Devasia's counsel:     If they have answered the question and then you again pause waiting for an answer, is that suggestive to you?

Hawkins:               I don't agree no.

. . .

Devasia's counsel:     I asked you if when you ask questions of [Lisa], you would ask them multiple times. Do you remember me asking that a moment ago?

Hawkins:               Yes.

Devasia's counsel:     And whether or not that—that in your training and experience by asking the same question multiple times to a child, that it suggested that their first answer was incorrect.

Hawkins:               It—it could be seen as that way.

. . .

Devasia's counsel:     Okay. Do you remember asking [Lisa] if she saw her body change in any way after the sexual abuse?

Hawkins:               Yes.

Devasia's counsel:     Do you remember asking that question multiple times?

Hawkins:               In different times in the interview, yes.

Devasia's counsel:     Do you remember asking it in succession once after she—she gave you a response and then asking it again?

44

| | |
|---|---|
| Hawkins: | I don't recall asking the same question the same way. |
| Devasia's counsel: | Do you recall pausing and waiting for an answer from [Lisa] after she had already answered the question? |
| Hawkins: | After she answered that question, I'm sure I did pause and wait for a response. |

Given this line of questioning, we hold the trial court did not abuse its discretion in holding Devasia opened the door to admission of the interview. Nor did the trial court err in admitting the entire video, which was necessary to show the "complete interview process" and make it "fully understood." *See Esquivel v. State*, No. 13-16-00468-CR, 2017 WL 6379944, at *9 (Tex. App.—Corpus Christi–Edinburg Dec. 14, 2017, pet. ref'd) (mem. op., not designated for publication) (holding defendant opened door to admission of minor complainant's video statement "by suggesting that [the complainant] was coached during the interview" because "the jury could have had a wrong impression regarding how the interview was conducted," so State "was entitled to offer the entire interview to show the complete interview process, which was necessary to make it fully understood.").[26]

We overrule Devasia's second issue.

---

[26] In light of our holding, we need not address the State's additional arguments that Devasia's opening argument and his questioning of Lisa opened the door to admission of the video.

## Cross-Examination of Brooke

In his third issue, Devasia argues the trial court abused its discretion in limiting his cross-examination of Brooke when she was recalled during the State's case-in-chief. Brooke testified at length[27] during the first day of trial and Devasia had an opportunity to cross-examine her. During his cross-examination, Devasia's counsel asked Brooke about the affidavit attached to her petition for divorce. The State recalled Brooke on the second day of trial to inquire about her purported signature on the affidavit.[28] The State on recall asked Brooke whether the signature on the affidavit was hers and she testified, "No sir." She testified that she did not recognize the signature. The State then moved to admit into evidence Brooke's driver's license reflecting her signature, and it passed the witness after.

Devasia's counsel next questioned Brooke about the affidavit and her petition for divorce. The following then transpired:

| Devasia's counsel: | While we're waiting . . . for your copy of the [divorce] petition, you're extremely supportive of your daughter about these— when it comes to these allegations [against Devasia]. Correct? |
|---|---|
| Brooke: | I am supportive to my daughter. |

---

[27] Nearly 100 pages of the reporter's record is devoted to Brooke's testimony in front of the jury.

[28] Brooke testified that the signature on the affidavit attached to her divorce petition was not hers. The affidavit, signed in 2016, stated she had had had no contact with Devasia for three years.

Devasia's counsel:          Have you always supported your daughter?

The State objected that Devasia's cross-examination was outside the scope of its recall regarding Brooke's driver's license and the signature on the affidavit, and that Devasia's "questions [had] already [been] asked and answered when she was on the stand for many hours yesterday." Devasia argued that his questions were proper because the "whole purpose of the divorce was her keeping the safety of [her] daughter in mind" and "now that we have this major question mark" as to whether the "affidavit [was] signed by her," the questions go to "the authenticity of her claims" that the "divorce was in order to support her daughter and keep her safe from her husband." The following then ensued:

| | |
|---|---|
| Devasia's counsel: | I am happy to recall her as one of the defense witnesses. We're relying on the State's subpoena. |
| The State: | Right. But you don't get—you don't get to just have an ad nauseam cross-examination. |
| Devasia's counsel: | I was trying to kill time while we were waiting for her document. |
| . . . | |
| The Court: | Let me just make a ruling. I'm going to sustain your objection. I think that your cross should be subject to that. If you did want to recall her in your case-in-chief, certainly you'd be allowed to. But, I mean, I think those questions were already asked and answered yesterday. |

47

Devasia's counsel:          Okay.  For timeliness purposes, Your Honor, I'm happy to recall her but she's already on the stand.  So that's why I was going there.

During his case in chief, Devasia recalled Brooke but he did not continue his line of questioning as to whether she had always "supported" her daughter.[29] Devasia argues that his cross-examination during the State's recall was necessary to "further challenge [Brooke's] credibility by asking [her] if she had always been supportive of [Lisa's] allegations against Mr. Devasia."  He argues that "[a]ny potential bias, or an attack on a witness' credibility, is always relevant."  Even if so, Devasia's cross-examination of Brooke was not limited. He cross-examined Brooke during the first day of trial when she was first called by the State, and he again called her during his case in chief, at which time he could have asked the questions he had earlier attempted to ask during the State's recall.  But Devasia chose not to engage in that line of questioning.  Moreover, Devasia concedes that testimony as to Brooke's credibility—specifically, with regard to whether she initially appeared to believe Lisa's allegations of abuse—had already been elicited:

> The evidence presented at trial by that point showed that [Brooke] did not call the police when [Lisa] told her that Mr. Devasia was aggressively sexually abusing her with "deep intercourse."  She had no concern, belief, or evidence that sexual abuse was happening in her home in Pearland or Mangalore until her daughter made an outcry.

---

[29]    During his opening statement, Devasia's counsel told the jury "at first [Brooke] tells the investigators that she doesn't believe her daughter, that her daughter's been having these other issues and she believes that she's angry over a cellphone."

48

Instead of calling the police, leaving Mr. Devasia, or investigating [Lisa's] claims, [Brooke] took her family on a religious retreat. When the family returned to Pearland, [Lisa] outcried to her youth ministers, and *they*, *not [Brooke]* contacted the authorities.

When the Pearland Police Department came to the house to investigate, [Brooke] originally told them she knew nothing about any sexual abuse, and that [Lisa] was falsely accusing her father because she was angry over a cellphone. [Brooke] was unconcerned when the police came to her door, and it was detectives who convinced her to be supportive of her daughter's allegations.

(Emphasis in original.)

Given the opportunity Devasia had to cross-examine Brooke during the first day of trial and during his own case in chief, and the cumulative nature of the cross-examination Devasia sought during the State's recall of Brooke, we hold the trial court did not err. *See, e.g.*, *Carroll v. State*, 916 S.W.2d 494, 498 (Tex. Crim. App. 1996) ("[A] trial judge may limit cross-examination when a subject is exhausted. . . ." ); *Irby v. State*, 327 S.W.3d 138, 145 (Tex. Crim. App. 2010) (observing trial court has "wide latitude to impose reasonable limits on [] cross-examination" during "interrogation that is repetitive or only marginally relevant") (quoting *Van Arsdall*, 475 U.S. at 679); *Lopez*, 18 S.W.3d at 222 ("The trial court maintains broad discretion to impose reasonable limits on cross-examination to avoid . . . the injection of cumulative or collateral evidence.") (citing *Lagrone v. State,* 942 S.W.2d 602, 613 (Tex. Crim. App. 1997)); *Garcia v. State*, 629 S.W.2d 196, 198–99 (Tex. App.—Corpus Christi–Edinburg 1982, pet. ref'd) (noting trial

court did not err in limiting scope of cross-examination of sexual assault victim when she was recalled; trial court gave defendant opportunity to demonstrate need for additional cross-examination and defendant did not do so).

We overrule Devasia's third issue.

**The Photos**

In his fourth issue, Devasia complains of the trial court's refusal to admit photos of his genitalia "in order to impeach [Lisa's] previous testimony." Devasia sought to introduce two photographs of his genitals, which he took the week before trial, "to corroborate his testimony that his penis bears unique characteristics." Devasia argues that his penis bears a scar from an adult circumcision[30] and that there are "black, discolored spots" on the head of his penis. Yet Lisa "could not testify to the very unique characteristics of his penis," which according to Devasia speaks to the veracity of her allegations.

Before attempting to proffer the photos, Devasia first sought permission from the trial court to show his genitals to the jury. The State objected, asserting it would be prejudicial for Devasia to show his genitals to the jury, and the trial court sustained the objection, stating, "there's been testimony already to—to what his penis looks like. . . . If you want to try to introduce photos, then lay the predicate and do that."

---

[30]     Devasia testified he was 37 when he was circumcised.

50

Devasia attempted to proffer two black-and-white photos of his penis, but the State objected because the photos were taken a week before trial, not between 2006 and 2014, the time period during which Lisa alleged Devasia assaulted her. The trial court held it was "not inclined to let photos in that were taken after the incident. I just think that would be highly prejudicial." Devasia argued:

> Your Honor, I would just, again, say this is more probative than prejudicial. This goes to the defense theory on this case. And the State's more than welcomed to argue to the weight of—of the pictures based on the timing. But I would still argue that they would come in and be—or be admitted because there's been nothing—no testimony or no cross-examination which the State has every right to do to suggest that there's been any change or altering to his genitalia since 2014.

The State argued the under Texas Rule of Evidence 403 the "prejudicial value dramatically and substantially outweigh[ed] any . . . probative value." The State argued that if the photos had been taken between 2006 and 2014, "that would be a different story." The trial court sustained the State's objection. However, the trial court allowed Devasia to draw a picture of his penis for the jury. He testified that his penis had always had black "blotch" markings on its head.

Because the trial court made a ruling on the State's Rule 403 objection, we assume it conducted a Rule 403 balancing test. *See Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997) (noting trial court is presumed to engage in balancing test once Rule 403 is invoked). In conducting a Rule 403 balancing test, the trial court must consider the following non-exclusive factors:

> (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence.

*Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). The factors "may well blend together in practice." *Gigliobianco v. State*, 210 S.W.3d 637, 642 (Tex. Crim. App. 2006).

The first factor, the probative nature of the evidence, weighs against admission because (1) the photos were taken years after the alleged abuse, (2) Devasia drew a picture of his penis for the jury, and (3) he testified about the "unique" characteristics of his penis. Devasia's black-and-white drawing showed the jury the scarring and discoloration on his penis. Lisa had already testified that she did not recall whether her eyes were open or closed when she was forced to perform oral sex on Devasia, and she also testified that he wore a condom when they had sex. Devasia's counsel asked her, "Do you remember anything being out of the ordinary about your father's penis?" Lisa asked Devasia's counsel to repeat the question. Devasia's counsel then asked Lisa about Devasia's condom use during sex. Lisa was never again asked about any distinguishing characteristics of Devasia's penis. The photos are thus not probative, and Devasia's statement that Lisa "could not testify to the very unique characteristics of his penis" is not consistent with the questions presented to her.

The second factor, the potential of the evidence to impress the jury in some irrational but indelible way, weighs slightly in favor of admission. It is unlikely the photos would have swayed the jury one way or the other insofar as Devasia's guilt is concerned, given that the jury saw Devasia's drawing of his penis and heard testimony from Devasia concerning his genitals' purported abnormalities. The third factor does not weigh either way, as there is nothing in the record that indicates the amount of time needed to question Lisa or any other witness about the photos, had they been admitted.

Finally, the fourth factor weighs against admission. The proponent's need for the photos was limited, at best, especially given Devasia's failure to follow up on his question to Lisa regarding any distinguishing characteristics of his penis. Further, Devasia drew a photo of his penis for the jury in an effort to show his penis's scarring and discoloration, obviating the need for the photos.

Having considered the Rule 403 factors, we hold the trial court did not abuse its discretion in finding the probative value was substantially outweighed by the danger of unfair prejudice, and in refusing to admit photos of Devasia's genitals.[31]

---

[31] In addition to the Rule 403 factors, additional factors may be considered in reviewing a court's decision to exclude photos. The non-exhaustive list includes the number of photos offered, their gruesomeness, their detail, their size, whether they are in color, whether they are close-up views, and whether the body depicted is clothed. *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002) (citing *Wyatt v. State*, 23 S.W.3d 18, 29 (Tex. Crim. App. 2000)). "A court, however,

We overrule Devasia's fourth issue.

## Cumulative Error

Devasia argues in his fifth issue that even if the errors were not harmful standing alone, they created a "cumulative harmful effect that effectively deprived Mr. Devasia of his right to present a complete defense." The Court of Criminal Appeals has opined that "[i]t is conceivable that a number of errors may be found harmful in their cumulative effect." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). However, the court said it was "aware of no authority holding that non-errors may in their cumulative effect cause error." *Id.*

We have already held that the trial court did not err in excluding evidence of previous allegations of sexual assault, admitting the forensic interview, limiting cross examination of Brooke, or excluding the photos of Devasia's genitalia. We thus need not reach this issue.

## Devasia's Reply Brief

In his reply brief, Devasia raises a new issue, asserting the trial court erred in refusing to allow defense counsel to refresh Lisa's memory during the Rule 412 hearing. "Generally, an appellant may not raise a new issue in a reply brief because Rule 38.3 allows courts of appeals to decide the matter prior to receiving the reply brief." *Chambers v. State*, 580 S.W.3d 149, 161 (Tex. Crim. App. 2019).

should not be limited to this list. The availability of other means of proof and the circumstances unique to each individual case should also be noted." *Id.*

54

However, appellate courts may consider "arguments and authorities in a reply brief that are related to the arguments in the original brief[.]" *Id.*

In *Chambers*, the Court of Criminal Appeals held the sufficiency claim raised in the appellant's reply brief was "part and parcel of the statutory interpretation issue he raised in his initial brief." *Id.* The court continued, "Appellant has consistently argued that the evidence is insufficient to show that the records were kept for a governmental purpose, and part of that sufficiency claim is based on how the statute should be interpreted." *Id.* Conversely, the issue Devasia raises in his reply brief regarding his ability to refresh Lisa's memory is a "completely independent issue" and not "part and parcel of the [] issue he raised in his initial brief." *See id.* Indeed, Devasia argues that he is entitled to raise the new issue because in its appellate brief, "the State made an issue that defense counsel 'improperly attempted to refresh [Lisa's] recollection of the potentially false accusations by using a statement that she did not create.'" The Texas Rules of Appellate Procedure "do not allow an appellant to include in a reply brief new issues in response to a matter pointed out in an appellee's brief, but not raised by the appellant in his original brief." *Wolfford v. State*, No. 01-18-00763-CR, 2019 WL 2750599, at *2 (Tex. App.—Houston [1st Dist.] July 2, 2019, no pet.) (mem. op., not designated for publication).

We overrule the issue in Devasia's reply brief.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).